*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

TAUHEED SALIK WILDER,

Defendant-Appellant.

UNPUBLISHED
September 28, 2023

No. 362134
Oakland Circuit Court
LC No. 2020-274572-FH

Before: GADOLA, P.J., and CAVANAGH and K. F. KELLY, JJ.

PER CURIAM.

Defendant, Tauheed Salik Wilder, appeals as of right his jury trial convictions of one count of being a felon in possession of a firearm, MCL 750.224f(2), one count of being a felon in possession of ammunition, MCL 750.224f(6), four counts of possession of a firearm during the commission of a felony (felony-firearm), second offense, MCL 750.227b(1), two counts of felonious assault, MCL 750.82, one count of carrying a concealed weapon, MCL 750.227(2), and one count of assault and battery, MCL 750.81. The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.13, to 58 months to 40 years' imprisonment for being a felon in possession of a firearm, being a felon in possession of ammunition, and carrying a concealed weapon; 58 months to 15 years' imprisonment for each felonious assault conviction; five years' imprisonment for each felony-firearm conviction; and 93 days in jail for assault and battery. We affirm.

## I. BACKGROUND

On August 30, 2019, at about 1:00 a.m., defendant and his brother, Keiuan, arrived at Bosco nightclub in Ferndale. Defendant had a reservation for a table. However, when the hostess explained that the table had been re-sold to someone else when defendant had not arrived by midnight, defendant became upset and argued with her. After defendant loudly called the hostess a rude name, the security team decided defendant and his brother would not be allowed into the club. A "shoving match" ensued as security escorted the two outside. They continued to argue with security when defendant punched one of the bouncers, Benjamin Brinker, in the face. This was captured on Bosco's front door surveillance camera. Defendant then started to run away,

-1-

beyond the view of the surveillance camera.   Defendant then backed up a couple steps, pulled out a gun, and pointed it at Brinker and two other bouncers, Taylor Williams and Randale Raleigh.  In response, Brinker and Williams pulled out their guns and shot at defendant first.  Defendant and Keiuan were both injured by nonfatal gunshot wounds.  Keiuan fled from the area.

Defendant stopped near the entrance of a shop just north of the Bosco entrance.  The security staff took shelter behind a parked car and instructed defendant to drop his gun.  Defendant then threw his gun down and fell to the ground unconscious.  Raleigh, a former Marine, took the magazine out of the gun, took the round out of the chamber, and placed the gun back down on the ground.  Raleigh testified that he disarmed the gun because he was not sure of Keiuan's whereabouts or whether he posed a threat.

The Ferndale Police responded to the scene and seized several guns including a Glock 19 and a Smith & Wesson, both registered to Williams, a Sig Sauer registered to Brinker, and a Taurus with the serial number scratched out.  At trial, the forensic DNA analyst testified that the Taurus contained a mixture of DNA from three people and that there was very strong support that defendant was a contributor.  Williams, Brinker, and Raleigh all testified that they saw defendant punch Brinker in the face and then pull out a gun.  The jury found defendant guilty of all counts.

## II.  JURY VENIRE

Defendant first challenges the makeup of the jury venire.  Defendant argues that he was denied his Sixth Amendment right to an impartial jury drawn from a fair cross section of the community.  Whether a defendant was denied his right to an impartial jury is a constitutional question we review de novo. *People v Williams*, 241 Mich App 519, 525; 616 NW2d 710 (2000). Below, defendant objected to the jury venire because there was only one African-American prospective juror.  Defendant argued that one African-American out of 50 prospective jurors did not fairly represent the proportion of African-Americans in the community.  The trial court denied defendant's objection, finding no proof that African-Americans were intentionally systematically excluded from the jury venire.

In order to make a prima facie case of a violation of the Sixth Amendment's fair-cross-section requirement, a defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community, (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community, and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process. *People v Bryant*, 491 Mich 575, 597; 822 NW2d 124 (2012) (citing *Duren v Missouri*, 439 US 357; 99 S Ct 664; 58 L Ed 2d 579 (1979)).  A systematic exclusion is one that is "inherent in the particular jury-selection process utilized." *Id*. at 615-616. In examining the second prong, courts must examine "the composition of jury pools and venires over time using the most reliable data available to determine whether representation is fair and reasonable." *Id*. at 599-600.

Here, defendant has met the first prong because there is no dispute that African-Americans are a distinct group in the community. *Id*. at 598.  As to the second prong, defendant has not provided any evidence that the representation of African-Americans in Oakland County jury venires is not fair and reasonable.  Defendant merely points out that there was one African-American in the jury venire from which his jury was selected.  To prove a prima facie claim, defendant must show that the representation of African-Americans is not fair and reasonable in

jury venires *over time*. See *id*. at 599-600. Defendant fails to present any data showing that African-Americans are underrepresented in Oakland County jury venires. Defendant asserts that prospective jurors in Oakland County are chosen from a list of residents with a driver's license or state identification. However, defendant offers no argument as to why this method would result in systematic exclusion of African-Americans, absent a technological error of the kind discovered in *Bryant*. Thus, defendant's argument fails.

Under the third prong, systematic disproportion demonstrates an infringement of the defendant's right to a jury drawn from a fair cross section of the community. Therefore, the trial court was mistaken that the exclusion must be intentional. Nevertheless, this is harmless error because defendant has not met his burden of showing that the representation of African-Americans in jury venires was not fair and reasonable.

### III.  WITNESS COACHING

Defendant contends that the prosecution coached a witness and that this amounted to prosecutorial misconduct. Alternatively, defendant argues he was denied the effective assistance of counsel when his attorney failed to object to Williams looking to the prosecution for direction during his testimony. We disagree.

To preserve an issue of prosecutorial misconduct, a defendant must object and request a curative instruction. *People v Isrow*, 339 Mich App 522, 529; 984 NW2d 528 (2021). Defendant did not take either of these steps. The issue is therefore unpreserved and is reviewed for plain error. *People v Cooper*, 309 Mich App 74, 88; 867 NW2d 452 (2015). A plain error is one that is clear or obvious, and the error must have affected the defendant's substantial rights. *Id*. A defendant's substantial rights are affected if the error affected the outcome of the lower court proceedings. *Isrow*, 339 Mich App at 529. If a defendant is able to establish plain error, appellate relief is only warranted if the error resulted in the conviction of an actually innocent person or "seriously affected the fairness, integrity, or public reputation of judicial proceedings*." People v Walker*, 504 Mich 267, 276; 934 NW2d 727 (2019).

Defendant's ineffective-assistance claim is likewise unpreserved because he did not move for a new trial or evidentiary hearing below, *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012), and his appellate motion to remand for that purpose did not include this theory within its scope, *People v Abcumby-Blair*, 335 Mich App 210, 227; 966 NW2d 437 (2020). "The question whether defense counsel performed ineffectively is a mixed question of law and fact; this Court reviews for clear error the trial court's findings of fact and reviews de novo questions of constitutional law." *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012). But "[w]hen there has been no evidentiary hearing and no findings of fact by the trial court, this Court reviews de novo the entire record to determine whether the defendant's trial counsel's representation constituted ineffective assistance of counsel." *People v Rose*, 289 Mich App 499, 524; 808 NW2d 301 (2010). Review of unpreserved claims of ineffective assistance is limited to "errors apparent on the record." *People v Spaulding*, 332 Mich App 638, 656; 957 NW2d 843 (2020).

Defendant argues that the prosecution coached Williams because he looked at the prosecutor before answering a question on cross-examination. On direct examination, Williams testified that when defendant and Keiuan were told to leave Bosco, they took a fighting stance and one of them said, "You don't want to do this." On cross-examination, Williams confirmed that he provided a statement to the police after the altercation. Defense counsel asked Williams to read his statement and began to ask where, within the statement, Williams reported the foregoing

comment. This question generated a hearsay objection from the prosecutor. Defense counsel then instructed Williams to read the statement. The prosecutor objected to the instruction as improper impeachment. After Williams was allowed to read his written statement, defense counsel again asked whether he reported in the statement that defendant or Keiuan said, "You don't want to do this." Williams apparently looked at the prosecutor before answering in the negative. When defense counsel said "You're looking at the prosecutor. Can you answer the question?", Williams explained, "I'm asking them am I supposed to answer this question (indiscernible) seeking guidance." The prosecutor again objected to improper impeachment.

When read in context, it is clear that this exchange does not constitute evidence that Williams was coached by the prosecution. This short line of inquiry by defense counsel was interrupted twice by objections from the prosecutor. Also, Williams previously expressed confusion about defense counsel's question. Merely glancing at the prosecutor before answering the question was not unreasonable under these circumstances. It is clear that Williams was expecting another objection from the prosecutor and was looking to see if he should answer the question or wait for a forthcoming objection.

Additionally, there was no indication that Williams answered the question untruthfully. Williams acknowledged that he did not report the comment "You don't want to do this" in his statement to police, thus confirming that his testimony was inconsistent with this earlier statement. There is nothing in the record to support the contention that the prosecutor engaged in misconduct that interfered with defendant's right to a fair trial.

Defendant alternatively argues that he was denied the effective assistance of counsel when his attorney did not object or ask Williams if the prosecution told him what to say on the stand. To make a claim that counsel was ineffective, a defendant must demonstrate that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different. *Trakhtenberg*, 493 Mich at 51 (citing *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984)). There exists a strong presumption that counsel's performance constitutes sound trial strategy. *Id*. at 52.

As mentioned above, Williams' answer was favorable to the defense because it impeached his testimony at trial. Therefore, there was little incentive for defense counsel to raise an objection or make an accusation of prosecutorial misconduct. Examination of witnesses is presumptively a matter of trial strategy. See *People v Putman*, 309 Mich App 240, 248; 870 NW2d 593 (2015). Defendant has not overcome the presumption that defense counsel's examination of Williams was sound trial strategy. See *Isrow*, 339 Mich App 532.

IV. SUFFICIENCY OF THE EVIDENCE

Defendant next argues that his convictions were not supported by sufficient evidence. We disagree.

"Challenges to the sufficiency of the evidence are reviewed de novo." *People v Xun Wang*, 505 Mich 239, 251; 952 NW2d 334 (2020). "[T]his Court reviews the evidence in a light most favorable to the prosecutor to determine whether any trier of fact could find the essential elements

of the crime were proven beyond a reasonable doubt." *Id.* This Court is to draw all reasonable inferences and make credibility determinations in support of the jury's verdict. *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000). Circumstantial evidence and reasonable inferences arising therefrom may constitute proof of the elements of a crime. *People v Savage*, 327 Mich App 604, 613; 935 NW2d 69 (2019).

Defendant first argues that the prosecution failed to prove defendant possessed a gun beyond a reasonable doubt. Defendant observes that the video footage does not show defendant in possession of a gun. Defendant's theory at trial was that the Taurus was planted by one of the bouncers after defendant was shot. Because defendant's convictions for being a felon in possession of a firearm, felonious assault, felony-firearm, and carrying a concealed weapon each required the jury to find defendant in possession of a firearm during the altercation, those convictions are directly at issue by this argument. Inasmuch as defendant's conviction of being a felon in possession of ammunition rested on the fact that his gun was loaded with ammunition, his conviction for that offense is likewise at issue here.

The prosecution presented sufficient evidence to allow the jury to find beyond a reasonable doubt that defendant possessed a gun. Williams testified that defendant punched Brinker, backed up several paces, and removed a gun from his waistband. Fearing that defendant would shoot him or Brinker, Williams shot at defendant first, then ordered defendant to throw his gun to the ground. Raleigh's recollection of the altercation was the same, namely, that defendant punched one of the bouncers, took a few steps backward, reached into his pants, and brought out a gun. Brinker's recollection of the evening was admittedly limited, but he likewise recalled defendant punching him, taking several steps away, then brandishing a gun. Defendant's contention that the bouncers were not credible lacks merit because the jury apparently believed these witnesses' accounts, and this Court must defer to the jury's credibility choices when it reviews the sufficiency of evidence. *Nowack*, 462 Mich at 400.

Furthermore, the bouncers' recollections were corroborated by DNA evidence. An expert in forensic DNA analysis testified that the DNA mixture on the Taurus handgun recovered from the crime scene was consistent with defendant's DNA profile. Considering the testimony as well as the corroborating DNA evidence, there was sufficient evidence for the jury to find beyond a reasonable doubt that defendant possessed the Taurus.

Defendant next argues that the prosecution presented insufficient evidence to prove he possessed the requisite intent to be convicted of felonious assault. The elements of felonious assault are (1) an assault, (2) with a dangerous weapon, (3) with the intent to injure or place the victim in reasonable apprehension of an immediate battery. *People v Avant*, 235 Mich App 499, 505; 597 NW2d 864 (1999). The elements of a crime may be proven by circumstantial evidence and reasonable inferences arising from that evidence. *People v Oros*, 502 Mich 229, 239; 917 NW2d 559 (2018). In *Avant*, the Court found that the victim's testimony that defendant pointed a gun at the victim's face was sufficient to support the defendant's conviction for felonious assault. *Avant*, 235 Mich App at 506.

Defendant was convicted of felonious assault for pointing a gun at Williams and Brinker. Defendant argues there was insufficient evidence that he intended to injure the victims or place them in apprehension of an immediate battery because they were pursuing him—not the other way

around. However, Williams, Brinker, and Raleigh all testified that defendant pointed a gun toward them after he assaulted Brinker. And Williams testified that he felt scared when defendant pointed the gun at him because he believed defendant would shoot him. While defendant's intent cannot be determined with certainty, it was reasonable for the jury to infer defendant's intent from his act of pointing a loaded gun toward Williams and Brinker. Therefore, the jury could find beyond a reasonable doubt that defendant intended to injure Williams and Brinker or place them in reasonable apprehension of an immediate battery.

## V. INEFFECTIVE ASSISTANCE OF COUNSEL

In addition to the issues raised by his appellate counsel, defendant presents several claims of ineffective assistance in the brief he submitted pursuant to Administrative Order No. 2004-6, Standard 4. Defendant asserts that his counsel rendered ineffective assistance when he (1) failed to impeach Brinker with surveillance footage, (2) failed to request gunpowder residue testing on defendant's clothing, (3) failed to introduce photographs of defendant's blood at the scene, (4) failed to retain a DNA expert, and (5) failed to move to suppress the Taurus handgun. We disagree.

## A. IMPEACHMENT EVIDENCE

First, defendant asserts that his trial counsel was ineffective for failing to impeach Brinker's testimony with surveillance camera footage of Brinker allegedly searching defendant before defendant entered the nightclub. We disagree.

This Court's review of a claim of ineffective-assistance in the absence of an evidentiary hearing[1] is limited to errors apparent on the record. *Abcumby-Blair*, 335 Mich App at 227. To make a claim of ineffective assistance of counsel, a defendant must demonstrate that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different. *Trakhtenberg*, 493 Mich at 51. The defendant bears the burden of establishing the factual predicate for his claim. *People v Muhammad*, 326 Mich App 40, 63; 931 NW2d 20 (2018).

Brinker testified that he was working as a security guard outside Bosco's entrance at the time of the altercation with defendant. Defense counsel questioned Brinker about his duties, specifically asking whether Brinker was responsible for conducting pat-down searches before patrons entered. Brinker said he was not personally tasked with searching patrons. He could not remember if somebody else was fulfilling that role on the night in question, nor did he know if defendant was searched. Defendant contends that defense counsel should have impeached Brinker with the surveillance video to demonstrate that Brinker had, in fact, searched defendant. Defendant opines that this impeachment strategy was critical because it would prove that Brinker lacked credibility and, more importantly, that defendant did not have a gun.

---

[1] This Court denied defendant's motion for remand. *People v Wilder*, unpublished order of the Court of Appeals, entered June 8, 2023 (Docket No. 362134).

Our review of the surveillance footage does not support defendant's argument. As the prosecution notes in its response to this issue, the poorly lit, low-quality recording makes it difficult to identify the various people in the video. However, it does appear to show defendant being searched by a bouncer wearing a dark shirt with distinctive light-colored stripes on the shoulders. The recording also captured the moment that defendant punched Brinker. Notably, the shirt worn by Brinker does not have the same distinctive light-colored stripes at the shoulders. The person wearing the distinctive shirt can be seen standing close to the street shortly before defendant assaulted Brinker, making it clear Brinker was not the person who searched defendant. Because the surveillance video does not reflect Brinker searching defendant, its value as impeachment evidence is limited. The recording does not contradict Brinker's denial of having searched defendant. Brinker could not recall if someone else was searching patrons or whether defendant had been searched, so the video does not contradict his testimony on those points either.

Defense counsel was clearly aware that the recording showed defendant being searched because he played the video for the jury during Keiuan's testimony. Defense counsel also raised this point in his closing argument, reminding the jury that it saw Brinker searching defendant and lingering in the belt area from which defendant purportedly withdrew a gun. This argument bolstered the overall defense theory that the bouncers were lying about what occurred in order to protect themselves from criminal liability. Defense counsel's performance was well within the scope of trial strategy, and defendant cannot establish deficient performance on the existing record. And it is improbable that presenting the video during Brinker's testimony, rather than Keiuan's testimony, would have led to a different result.

## B. GUNPOWDER RESIDUE TESTING

Defendant next contends that defense counsel was ineffective for failing to request that defendant's clothes be tested for gunpowder residue. We disagree.

Defendant did not cite this allegation as a matter that required factual development in his motion to remand, so it is unpreserved. Our review of unpreserved claims of ineffective assistance is limited to errors apparent on the record. *Spaulding*, 332 Mich App at 656.

Defense counsel "always retains the duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Trakhtenberg*, 493 Mich at 52 (quotation marks and citation omitted). When an attorney fails to exercise reasonable professional judgment in deciding against pursuing a certain avenue of investigation, the attorney's representation falls below an objective standard of reasonableness. *Id*. at 52-53.

Here, it was reasonable for defense counsel to not request gunpowder residue testing. Many law enforcement agencies have strayed away from gunpowder residue testing out of concern about its reliability. Indeed, this Court has addressed this issue several times, albeit in unpublished decisions.[2] See, e.g., *People v Fulgham*, unpublished per curiam opinion of the Court of Appeals,

---

[2] "Unpublished authorities are not binding on this Court but may be considered as persuasive authority." *People v Swenor*, 336 Mich App 550, 563 n 7; 971 NW2d 33 (2021).

issued January 19, 2016 (Docket No. 323281), p 2 (noting trial testimony indicating that police "no longer perform gunshot residue testing because it is not considered accurate"), lv den 499 Mich 971 (2016). The record provides no basis to infer that defense counsel was unaware of this development in investigative tools and strategies. To the contrary, defense counsel is entitled to a presumption of effective representation. *Abcumby-Blair*, 335 Mich App at 236-237. Recognizing that gunpowder residue can be deposited on a person in close proximity to a fired gun, and without evidence firmly demonstrating how far defendant was from the bouncers' guns when they were fired, defense counsel could have strategically chosen not to pursue testing that could ultimately result in evidence favorable to the prosecution (i.e., positive for gunshot residue).

Additionally, by choosing not to request gunpowder residue testing, defense counsel was able to cite the absence of such testing as a flaw in the prosecution's case during closing argument. Comparing the prospect of possibly uncovering evidence that might appear incriminating against the commonly used defense strategy of highlighting omissions in the criminal investigation, defense counsel could have reasonably decided that the latter strategy was the more prudent option. Defendant has not established that defense counsel's performance relative to this issue was deficient. For the same reason, defendant fails to show a reasonable probability that, but for defense counsel's conduct, the result of the trial would have been different.

## C. CRIME SCENE PHOTOGRAPHS

Next, defendant asserts that he was denied effective assistance when his counsel failed to introduce photographs of defendant's blood in the doorway of Rose Frame Shop, the store north of Bosco. However, these photographs are not part of the existing record, leaving this Court without the necessary factual predicate for his claim. Instead, defendant merely asserts in an affidavit that the Ferndale Police took pictures of the blood-stained wall.[3] According to defendant, this evidence would have demonstrated that he was shot in the back as he fled from the bouncers, then took cover in the Rose Frame Shop doorway and leaned his injured back against the wall.

Defendant overestimates the exculpatory value of such photographs. One of the prosecution's witnesses testified that defendant crouched in front of Rose Frame Shop after being shot. Thus, the jury was already informed that defendant tried to take cover once he was wounded. The mere fact that there was blood on the wall, purportedly from defendant's back, does not necessarily mean he was shot in the back. A bullet that struck defendant's frontside could have passed through his body and exited his back, and there was no medical evidence presented to clarify this point. And even if the jury believed that defendant had been shot in the back, that fact would not exonerate him in any event. Neither the presence of blood in the shop's doorway nor the location of his gunshot wounds speak to whether defendant was in possession of a firearm and used it to commit the charged offenses. Consequently, it was not objectively unreasonable for defense counsel to refrain from proffering the pertinent crime scene photographs.

---

[3] Defendant's affidavit is likewise not part of the lower court record, but was submitted to this Court as an offer of proof.

## D. DNA EXPERT

Defendant also challenges defense counsel's failure to retain an expert to rebut the testimony offered by Meagan Connolly, the prosecution's expert in forensic DNA analysis. Defendant's claim of error rests on a faulty factual predicate and is, therefore, without merit.

Defendant opines that an expert was necessary because Connolly's incriminating conclusion—that there was very strong support to conclude that defendant contributed to the DNA mixture on the Taurus—was impossible and contradicted her earlier testimony. The basis for this claim of error arises from Connolly's description of the evidence she received for testing. The transcript reflects Connolly testifying that five people were identified as "associated" with the case, but she received buccal samples from only three of those individuals: "Keiuan Wilder, Randale Raleigh, and Toffee Breven (ph)." Accepting that statement as true, defendant reasons that Connolly could not have reached any properly supported conclusion as to whether his DNA was on the gun because she did not have a sample of his DNA for comparison purposes. Having reviewed the full record, we find defendant's position unpersuasive.

The foregoing reference to "Toffee Breven" is the only mention of a person by that name in the record. Connolly's written report was admitted at trial and names five "associated" individuals: Raleigh, defendant, Williams, Keiuan, and Brinker. Because Breven is not listed as an associated individual, and Connolly specifically stated that she received buccal samples from three of the five identified people, there is good reason to believe that the reference to Breven is the product of an error in the transcript or that Connolly simply misspoke. Further, Connolly's report identifies Item 33 as a "tape-sealed paper bag containing two swab boxes each containing one swab identified as collected from Tauheed Wilder." This is consistent with testimony that a detective collected defendant's DNA sample at the hospital several days after the shooting, and subsequently sent the buccal swabs to the Oakland County Sheriff's Department crime laboratory. Moreover, in describing the results of her testing relative to the Taurus firearm, Connolly said, "Based on the DNA typing results obtained, it is approximately 40.4 billion times more likely that the DNA originated from item 33, *which is the sample from Tauheed Wilder*, and two unrelated, unknown individuals than if it had originated from three unknown, unrelated individuals." (Emphasis added.) Viewing the record as a whole, it is apparent that Connolly received and analyzed defendant's DNA sample and the reference to "Toffee Breven" was clearly a gaffe or a transcript error. Because defendant's argument is premised on a faulty factual predicate, this ineffective-assistance theory lacks merit.

## E. SUPPRESSION OF THE TAURUS HANDGUN

Defendant argues that he was denied effective assistance of counsel because his attorney failed to file a pretrial motion to suppress the Taurus handgun. Defendant contends that the gun was "tainted" by Raleigh's handling of the weapon to remove the ammunition after the shooting. But "taint" in the lay sense used in defendant's argument is not a basis for excluding evidence. Defendant's brief contains general principles of law, but he does not apply the facts of his case to the law. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no

citation of supporting authority." *People v Kroll*, 341 Mich App 217, 236 n 15 (quotation marks and citation omitted). Therefore, defendant has abandoned review of this issue on the merits. *Id.*

## VI. PROSECUTORIAL MISCONDUCT

Defendant did not preserve his *in propria persona* prosecutorial-misconduct claims by objecting to the allegedly improper remarks before the trial court and requesting a curative instruction. *Isrow*, 339 Mich App at 529. We review unpreserved claims of prosecutorial misconduct under the plain-error rule described in Part III of this opinion.

The prosecution described the circumstances leading up to the shooting in its opening statement, asserting that after defendant punched Brinker, he took a few steps away, turned around, and "pulls out a gun from his right pocket[.]" Defendant challenges this statement as improper because there was no evidence that defendant took a weapon out of his right pocket. We agree that the prosecution's comment was not ultimately supported by the evidence, but it does not provide a basis for appellate relief.

"Opening statement is the appropriate time to state the facts that will be proved at trial." *People v Ericksen*, 288 Mich App 192, 200; 793 NW2d 120 (2010). Defendant is correct that neither the surveillance video nor the witness testimony specifically supported the prosecution's assertion that defendant removed the gun from his right pocket. Williams indicated that defendant "produce[d] the gun from his waistband," Brinker said only that defendant "pulled a pistol out," Raleigh testified that defendant brought a pistol out of his pants, possibly from his underwear. Even so, the ultimate question in analyzing claims of prosecutorial misconduct is "whether a defendant was denied a fair and impartial trial." *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007). The distinction between defendant removing a gun from his right pocket as opposed to some other area of his pants is insignificant in the context of this case and undoubtedly did not deprive defendant of a fair trial. "When a prosecutor states that evidence will be submitted, and the evidence is not presented, reversal is not warranted if the prosecutor did so acting in good faith." *People v Johnson*, 315 Mich App 163, 201; 889 NW2d 513 (2016). There is simply no basis to conclude that the prosecution intentionally misstated the anticipated evidence.

Defendant also argues that the prosecution misrepresented the evidence during closing argument. In pertinent part, the prosecution argued that the jury should find that defendant possessed the Taurus because that conclusion was supported by Raleigh's testimony, the DNA evidence, and the fact that the Taurus's serial number had been removed. Expanding on this final point, the prosecution said, "So each and every other weapon that was at the scene had a serial number, and that was accounted for Mr. Brinker, Mr. Williams, and Mr. Raleigh." According to defendant, the prosecution's comment was improper because Raleigh did not turn over his weapon on the night of the shooting.

Defendant is correct concerning the evidence; Raleigh testified that the police did not request his gun and he did not turn it over. Additionally, a detective indicated that two guns registered to Williams and one gun registered to Brinker were recovered at the crime scene, but could not recall if there was a "fourth" gun. Considering the detective's incomplete memory on this point together with Raleigh's testimony that the police did not ask him for his gun, we agree that the quoted portion of the prosecution's closing argument was unsupported by the evidence.

That is, there was no evidence that Raleigh was tied to one of the guns from the crime scene via serial number registration.

Nonetheless, defendant cannot establish on this record that the prosecution's comment requires appellate relief. To the contrary, this Court "cannot find error requiring reversal where a curative instruction could have alleviated any prejudicial effect." *People v Callon*, 256 Mich App 312, 329-330; 662 NW2d 501 (2003). Defendant suggests that a curative instruction would not have been effective in this instance because "the damage was done" at the moment the prosecution misstated the evidence. However, this Court presumes appropriate instructions cure most instances of prosecutorial misconduct in closing argument, *Ericksen*, 288 Mich App at 199-200. With a timely objection, the jury could have been instructed to disregard the prosecution's misstatement, and this Court presumes jurors follow such instructions. *Id*. at 199. Thus, defendant is not entitled to relief. *Callon*, 256 Mich App at 329-330.

Defendant alternatively argues that he was denied the effective assistance of counsel when his attorney failed to object to the prosecution's improper closing argument. "Defense counsel is given wide discretion in matters of trial strategy because many calculated risks may be necessary in order to win difficult cases." *People v Unger*, 278 Mich App 210, 242; 749 NW2d 272 (2008). "Furthermore, declining to raise objections, especially during closing arguments, can often be consistent with sound trial strategy." *Id*.

Inasmuch as the prosecution's improper comment was unsupported by evidence and directly contradicted defense counsel's own closing, it is difficult to imagine what strategic purpose was served by allowing the comment to go unchallenged. Concerns over drawing attention to the prosecution's comment would not be compelling, as it would benefit the defense to emphasize that Raleigh's gun was not, in fact, "accounted" for. But even if we were to conclude that defense counsel's performance was deficient in this regard, it is improbable that failure to object affected the outcome of the proceedings.

Defense counsel's entire closing argument focused on a single theme: that the bouncers' accounts were self-serving and crafted to protect themselves from liability for shooting defendant and Keiuan. Defense counsel noted that Raleigh's gun was not turned over to the police and argued that Raleigh inexplicably walked into the line of fire to unload the Taurus because he had to develop an explanation for the presence of his DNA on the gun.[4] And despite the prosecution's misstatement, the evidence was clear with respect to Raleigh's gun. Raleigh testified on direct examination that the police never asked him to turn over his weapon and he confirmed this yet again on cross-examination. The jury was properly instructed that it had to decide the case on the evidence and that lawyer's arguments did not constitute evidence. Given the clarity of the testimony concerning this issue, there is little reason to believe the jury was misled by the prosecution's misstatement. Consequently, defendant cannot establish a reasonable probability of

---

[4] Connolly did not testify regarding whether Raleigh could have been a contributor to the DNA mixture on the Taurus, but her report indicates that she could not rule out Raleigh as a contributor.

a different outcome but for defense counsel's failure to object to the prosecution's improper closing argument.

## VII. CUMULATIVE ERROR

Lastly, defendant argues that the cumulative effect of the foregoing errors had a devastating impact on any chance of a successful defense and that, absent the errors, the prosecution's case would not have supported defendant's convictions. We disagree.

We review the effect of multiple errors to determine if the cumulative effect denied the defendant a fair trial. *People v Schrauben*, 314 Mich App 181, 193; 886 NW2d 173 (2016). "[T]he effect of the errors must have been seriously prejudicial in order to warrant a finding that defendant was denied a fair trial." *Id*.

The only errors identified here were the prosecutor's misstatements of evidence in the opening statement and closing argument. The prosecution's closing argument was the more significant error in that it undermined the defense theory, but it did not rise to the level of requiring a new trial, even coupled with defense counsel's failure to object, because the jury was properly instructed and heard a persuasive counterargument from defense counsel. But the minor discrepancy between the prosecution's opening statement and the evidence that defendant withdrew the gun from his waistband or underwear had virtually no prejudicial effect. Because of the inconsequential nature of this second error, we cannot conclude the cumulative effect of the errors deprived defendant of a fair trial. *Schrauben*, 314 Mich App at 193.

Affirmed.

/s/ Michael F. Gadola
/s/ Mark J. Cavanagh
/s/ Kirsten Frank Kelly

-12-